# CASES DETERMINED

AT THE

*January Term, 1887.*

---

GAVENEY and another, Respondents, vs. GATES, Appellant.

*December 21, 1886 — January 11, 1887.*

*Sale of chattels: Contract construed.*

The contract between the parties herein, made by numerous letters, is *held* to have been that shingles shipped by the defendant to the plaintiffs were not sold to the latter for what they could " afford to pay," but were *to be sold by them* and the net proceeds of the sales applied in payment for flour sent by them to the defendant.

APPEAL from the Circuit Court for *Clark* County.

The facts will sufficiently appear from the opinion. There was a verdict for the plaintiffs for $151.05, and from the judgment entered thereon the defendant appealed.

*R. J. MacBride*, for the appellant.

For the respondents there was a brief by *Ring & Youmans*, and oral argument by *Mr. Ring*.

ORTON, J. The respondents brought this suit against the appellant to recover the sum of $475, the sum agreed to be paid for the sale and delivery of 100 barrels of flour. The defendant pleaded payment and a counterclaim of $355 as the value of 355,000 shingles sold and delivered to the plaintiffs. The plaintiffs in their complaint admit payment on said flour of $150, and that the defendant " is entitled to a further credit thereon of $71, for and account of three

car-loads of shingles voluntarily shipped by the defendant to the plaintiffs in October, 1883, to be disposed of by them, and credited to him at twenty cents per thousand, or such price as they could afford to allow him, which plaintiffs aver is the sum of twenty cents per thousand."

What the contract between the parties was as to the shingles was educed from the following correspondence between them: (1) From the defendant to the plaintiffs, September 20, 1883: "I am going to send you a car-load of shingles, and will take whatever you think right, and will take it in flour, feed, or anything else, any time this fall or winter. Would like to send you two or three car-loads, but dare not be so bold, and will only send one car until I hear from you." (2) From plaintiffs to defendant, September 22d: "Your postal of yesterday is received. Send the car of shingles, and *we will sell them.* There seems to be quite a demand just now. We will try and *sell yours* all the time, providing the condition is right." (3) From defendant to plaintiffs, September 26th: "I have sent you one car of No. 1 shingles. Do the best you can. That will satisfy me. If you can't afford to pay a dollar besides the freight, less will do. I am going to send you another car soon." (4) From the same to the same, September 27th: "I send you two cars No. 1 shingles. 101½ thousand, 128,000–229,000, which I hope to get a dollar a thousand, net; but do the best you can and I will be satisfied." (5) From the same to the same, October 1st: "I have already sent you three car-loads of No. 1 shingles, and perhaps this will be too many, but do the best you can, and if you say so I will ship you a car of better shingles. I thought, at a dollar besides the freight, those No. 1 shingles would sell like hot cakes." (6) From plaintiffs to defendant, October 1st: "We did not intend to have you send more than one car of No. 1 shingles, but wanted a car of better quality. Wakefield & Trow sell at Merrillan, No. 1,

Gaveney and another vs. Gates.

at 80 cents or 85 cents, and freight from there, is only $15 per car, while on yours it is $24 per car. We will try to have the other yard take a part of them, but if it does it would want them on as favorable terms as shingles can be purchased elsewhere." (7) From defendant to plaintiffs, October 1st: "Yours of October 1st is received. I don't want you to pay any more than you can afford to, if it ain't but twenty cents per thousand I shall not blame you. They are not such shingles, however, as Wakefield & Trow sell at 90 cents. Such shingles as he sells at that we offer at 75 cents. But do the best you can, and I will not ship you any more until you order." (8) From plaintiffs to defendant, October 7th: After unimportant preliminaries, and stating that Trow's shingles are as good as his, and the freight less, they say: " We are willing to do what we can to help you out on these shingles, but it looks as though it will take at least two years to dispose of them here. *After realizing our freights, we* will credit you with sales, as we have not money enough in our business so that we can afford to lock up so much. We will ship you fifty barrels of flour as soon as we can get wheat enough to make them, but very little is coming to market now." (9) From defendant to plaintiffs, October 10th: "Please ship us 50 barrels of flour as soon as you can; and about the shingles, do the best you can *out of them* and that is all I want. I will not ask you for any money *out of them*, and don't want you to pay any more than you can buy the same kind at, and want you to have all the time you want to pay for them." (10) From same to the same, October 12th: After informing the plaintiffs that one Lockway had repeatedly written and telegraphed to him that he would send him the money for the shingles the plaintiffs had in their hands, he says: " I would rather you would take care of the shingles. If there is so much money there, and he has plenty of it, let him pay it to you, *as that would pay both of us* and suit me

better; and what I want you to do is *to sell the shingles if you can, and let me lose what there is to be lost*, as you are not in any way to blame for the shipment. I do not know Mr. Lockway, and I would not think of taking the shingles *out of your hands* unless you wanted me to and he paid for the same. *Any disposition* you make of the shingles will be satisfactory." (11) From plaintiffs to defendant, October 15th: After saying that they had tried to sell the third car-load of shingles to one Hotchkiss, who kept another lumber yard, and had offered a car-load to Lockway for one dollar per thousand and freight, they say further: "We will let him have, say, 100,000 or more of your shingles at, say, $1 per thousand and freight, *and pay you all he pays*, the freight to apply on the other shingles. . . . Name the price and freight, and we will deliver the shingles to him on payment of the money, *and remit the same to you.* If he is going into the shingle trade, which I think is doubtful, we would rather he had them of you than anywhere else."

These are all the letters or postal cards which throw any light upon the contract. The proposition of the defendant is contained in the first letter. He wished to send the plaintiffs a car-load of shingles, and take in exchange for it flour or feed, etc., at any time that fall or winter. The second letter is an acceptance of the proposition: "Send the car of shingles, and *we will sell them*," etc. This made the first contract between the parties. A car-load of shingles was to be sent to the plaintiffs *to sell* for the defendant, and the proceeds to be applied upon flour and feed which the defendant was to have that fall or winter from the plaintiffs. The third letter shows only a compliance on the part of the defendant of this contract: "I have sent you one car No. 1 shingles. Do the best you can. That will satisfy me. If you can't afford to pay a dollar besides the freight, less will do." The first car-load is thus disposed of. As to that there can be no doubt that the plaintiffs were to sell the

shingles for what they could reasonably obtain. This letter contains another proposition: "I am going to send you another car soon." The fourth letter is a notification by the defendant to the plaintiffs that he had sent to them two more car-loads of No. 1 shingles. "I send you two cars No. 1 shingles, 229,000, which I hope to get a dollar a thousand, net; but do the best you can and I will be satisfied." The fifth letter is a repetition of the others, and a summing up of the shingles sent. "I have already sent you three car-loads of No. 1 shingles, and perhaps this will be too many, but do the best you can. I thought, at a dollar besides the freight, those No. 1 shingles *would sell* like hot cakes." This is another proposition, fulfilled on the part of the defendant before its acceptance by the plaintiffs. But what is this proposition? It is most clearly that the two other car-loads were sent by the defendant to the plaintiffs, to be sold by them for what they could reasonably obtain, and that the proceeds should be applied on the feed or flour that the defendant was to have from the plaintiffs that fall or winter, the same as the first. No other terms or conditions are expressed or contemplated. In the sixth letter the plaintiffs complain that the defendant had sent the two other car-loads, and expressed doubt about their ability to sell them at a dollar per thousand. "We did not intend to have you send more than one car of No. 1 shingles." In the seventh letter the defendant attempts to allay the anxiety or fear of the plaintiffs, in respect to the price for which they might be able to sell the shingles, and he says: "I don't want you to pay more than you can afford to, if it ain't but twenty cents per thousand I shall not blame you. . . . Do the best you can, and I will not ship any more until you order."

Thus far there has been no acceptance by the plaintiffs of the proposition of the defendant, or its terms, that he had sent them two more car-loads of shingles *to be sold by them*

for what they could reasonably obtain, to be applied upon flour or feed that he might have of them during the fall or winter. Besides the acceptance of the proposition reasonably implied by the delivery of 100 barrels of flour of value supposed to be nearly equivalent to the proceeds of the three car-loads of shingles sold and to be sold by them, the plaintiffs made their formal acceptance by letter of the terms of the proposition: (8) From the plaintiffs to the defendant, October 7th, 1883: After speaking of the unfavorable chances of making sales of the shingles at the price supposed to be reasonable by the defendant, the plaintiffs say in this letter: "We are willing to do what we can to help you out on these shingles, but it looks to us as though it will take at least two years *to dispose of them* here. *After realizing our freights, we will credit you with sales,* as we have not money enough in our business so that we can afford to lock up so much." The ninth and tenth letters from the defendant to the plaintiffs of the 10th and 12th of October make no change in the above terms. The first asks for fifty barrels of flour, and says: "About the shingles, do the best you can *out of them* and that is all I want. I will not ask you for any money *out of them,* and don't want you to pay any more than you can buy the same kind at, and want you to have all the time you want to pay for them." The second speaks of Lockway wishing to purchase some of these shingles directly from him, and of his refusal, and of his referring him to the plaintiffs for that purpose, and says: "I trust, and I would rather you would take care of the shingles. . . . Let him [Lockway] pay it to you, *as that would pay both of us* and suit me better; and what I want you to do is *to sell the shingles if you can, and let me lose what there is to be lost,* as you are not in any way to blame for the shipment. . . . Any disposition you make of the shingles will be satisfactory." The eleventh letter and the last one having any bearing

upon the terms of the contract, is from the plaintiffs to the defendant, dated October 15th. In this letter the plaintiffs speak of their efforts to sell Lockway a large bill of the shingles for one dollar per thousand and freight, and ask the defendant to refer him to them; and they close by saying: "I think we understand each other perfectly."

We cannot but think that the true and fair construction of the language of these mutual letters, from which the terms of the contract between the parties are to be derived, is that the defendant sent the shingles to the plaintiffs to sell at the best price they could reasonably obtain, and account for the proceeds, deducting the freight and expenses of selling, and apply them in payment for any flour or feed which the defendant might have had of them. The defendant, under this contract, obtained from the plaintiffs 100 barrels of flour, at the rate of $4.75 per barrel; and the plaintiffs have had of the defendant 355,000 of No. 1 shingles to sell for him, and which they have sold and received the purchase price thereof in money, and paid thereon about $72 freight, to be deducted therefrom.

It is true that the counterclaim of the answer, after an allegation of payment, goes upon a *quantum meruit*. But this is not inconsistent with the contract; for the best and fairest criterion of what the shingles were reasonably worth and of their market value is what the plaintiffs sold them for in market, so far as *they* are concerned. If the plaintiffs had sold these shingles at 50 cents per thousand, using reasonable care and diligence, and could not have gone into the market and purchased shingles of the same quality for less than one dollar per thousand, they would have thought it a great hardship, under this contract, to be compelled to account to the defendant for the price last named. And so if the plaintiffs had watched the chances of the market, and found some person who, under the stress of circumstances, would be willing to sell them shingles of a similar quality

for fifty cents per thousand, when they had actually sold these shingles at a dollar per thousand, the defendant, if compelled to receive for them the price at which under such or any circumstances the plaintiffs might have supplied themselves with such shingles, might justly complain.   In both of these cases these shingles would be submitted to the uncertain and contradictory evidence of quality and comparative and market value, which would very likely work injustice to one or the other of the parties.   But it is sufficient that there is nothing in the contract of the parties, as determined by their correspondence, that would lead to any such unfair presumption.   Every circumstance and condition of things about this transaction of barter or exchange of flour for shingles repels any such presumption.   The price of the flour was fixed and undisputed, and bills thereof rendered.   But as to the shingles, no price was fixed or ever claimed by the parties, and the shingles were consigned to the plaintiffs at their place and market, distant from that of the defendant as consignor; and about the market value of shingles at that place the plaintiffs may be presumed to have had superior knowledge, and would have had the better judgment, and yet they made no certain offer of any price they were willing to pay, and never said a single word about market value or the price at which they could have supplied themselves with the same article.   On the other hand, they were all the time consistent in saying to the defendant: "Send the shingles and we *will sell them.*"   "We will try and *sell* yours all the time."   "After realizing our freights, we will *credit you with sales,*" etc., and other similar statements.   This made a *certain* criterion of adjustment, and one perfectly fair and equitable to both parties. The circumstances confirm what would appear to be the clear and indisputable terms of the contract.   It is significant that the plaintiffs allege in their complaint " that the defendant voluntarily shipped to them the shingles, *to be*

*disposed of by them and credited to him* at twenty cents per thousand."

We have occupied so much space, and perhaps too much and unnecessarily, in order to ascertain what the contract between the parties in relation to the shingles really was, as that is the only question in the case. The learned judge before whom the case was tried, instructed the jury as follows: "There is no dispute what they agreed to. The agreement was that the plaintiffs should allow the defendant for the shingles *what they thought* they could afford to." "They are to pay what they can afford to pay, or, which amounts to the same thing, whatever they could get the same class of shingles for elsewhere and get them delivered at Independence." "I think that is the only question for you to determine,— is what they could have supplied themselves with the same grade of shingles for from other places." The learned judge, probably from memory, slightly misquotes an expression in one of the defendant's letters in support of the above instructions. There is language something similar in one of his letters, but following the language, "and about the shingles, do the best you can *out of them* and that is all I want," and that letter is an answer to one from the plaintiffs saying that "after realizing our freights we will credit you with sales." The plaintiffs never assented to any other terms than to account for sales of the shingles. Any expressions in the defendant's letters which have been made the subject of argument as showing the consignment or delivery of the shingles on any other terms, are easily explained by the fact that the plaintiffs were all the time troubled about what they could get for the shingles, and complained of the lowness of the market for such shingles, evidently in order to satisfy the defendant if they should be compelled to sell the shingles for less than one dollar a thousand and freight, the price which the defendant was insisting they ought to bring; and the defend-

ant repeated, "do the best you can." "I don't want any more;" and claimed that the shingles which were selling for less than one dollar per thousand were of inferior quality to his, and that he did not want any more than shingles of the *same quality* as his shingles could be purchased for in that market, and *that* price he encouraged the plaintiffs to think they would be able to obtain in proper time, and he was willing that they should have all the time they wanted to sell them in, even two years.

One Lockway, a witness for the defendant, was asked: "Do you know what *Gaveney & Comstock* sold these particular shingles for at Independence that year?" (two or three years before.) This question was objected to by the plaintiffs' counsel, and the objection sustained. One of the plaintiffs, *Comstock*, on cross-examination as a witness, was asked by the defendant's counsel: "What did you sell these No. 1 shingles for in the month of October, 1883,—how much a thousand?" The objection of the plaintiffs' counsel to this question was sustained. "Did you sell these same No. 1 shingles in Trempealeau county, Independence, for $1.60 a thousand?" "Will you state to the jury how much you realized from the sales of these 355,000 shingles shipped to you by *J. L. Gates* in September and October, 1883, over and above the cost of freight and other expenses in handling and disposing of them?" These two questions were asked, with the same ruling. It may be as well to say here that we think that, according to the terms of the agreement, the last question asked forms the basis of the proper adjustment of the defendant's claim for the shingles and the correct criterion of determining the amount. These rulings of the court in respect to the evidence, and the above instruction to the jury, make clear the view of the circuit court as to what was deemed the correct construction of the contract, and we think they were clearly and radically erroneous.

Gaveney and another vs. Gates.

The testimony on the trial, in respect to the market value of No. 1 shingles, and the quality of the defendant's shingles in fact, and in comparison with the shingles of other persons at Independence and elsewhere, was, as might have been anticipated, in wide and irreconcilable conflict and contradiction. The jury were left to spell, if not to guess, out a just verdict from such uncertain evidence, by such an uncertain criterion. In such a case an approximation to a just verdict would be a matter of mere chance, when the contract has furnished the only certain, fair, and reasonable basis for the adjustment of the defendant's claim and the plaintiffs' liability. The plaintiffs have sold all of the shingles for cash at some price, no matter what if the sale was fair and honest, and the most just and reasonable thing for them to do is to account for such sales, deduct the freight and their expenses, and credit the balance on the flour. Why not? This, at least, would be carrying out the contract as we understand it, and this they should do.

Besides the errors above considered, the circuit court erred in allowing the following questions to be asked by the plaintiffs' counsel of one of the plaintiffs as a witness, against the objection of the defendant's counsel: "Tell the jury what you could have purchased, from other sources, No. 1 shingles that would have sold for the same price," etc. "What amount can you reasonably afford to credit to *Mr. Gates* on account of these shingles? How much per thousand?" "State what you could afford to pay, and how you arrive at it." The first question involves the necessity of ascertaining the price at which the shingles were sold as "the same price" mentioned therein, when all evidence as to the price at which they were sold was excluded. The witness answered that "he could have got them delivered at Independence for 75 cents a thousand, free of all charges," and that "75 cents a thousand is the

highest amount we could afford to allow *Mr. Gates,*" etc. The court instructed the jury that the plaintiffs were to pay what they could afford to pay, and "*what they thought*" they could afford to pay, and that such was the contract. The witness stated what they thought they could afford to pay, and so the case was foreclosed; and the jury might take that as the rate, and they probably did, and deducted the freight from the 75 cents per thousand, and found that that was all the plaintiffs could afford to pay. What they could afford to pay was what they sold the shingles for, deducting freight and expenses, and this was what the circuit court should have ruled.

We have given more space to the consideration of this case on account of the importance of the question involved, and out of deference to the candid and able counsel of the respondents and to the learned judge before whom the case was tried, who honestly entertained a different view of the contract than the one above expressed.

*By the Court.*— The judgment of the circuit court is reversed, and the cause remanded for a new trial.